DAMIEN M. SCHIFF, No. 235101
Email: dschiff@pacificlegal.org
LAWRENCE SALZMAN
Email: lsalzman@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

JEREMY TALCOTT, No. 311490
Email: jtalcott@pacificlegal.org
Pacific Legal Foundation
1212 W. Amerige Ave.
Fullerton, California 92833-2709
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

KATHRYN D. VALOIS*, Fla. Bar No. 1010150
Email: kvalois@pacificlegal.org
Pacific Legal Foundation
4440 PGA Boulevard Suite 307
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
Facsimile: (916) 419-7747
* *Pro Hac Vice*

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWARD ITEN,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>COUNTY OF LOS ANGELES,<br><br>　　　　　Defendant. | No. 2:21-cv-00486-DDP (JEMx)<br><br>**AMENDED & SUPPLEMENTAL COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF (DEMAND FOR JURY TRIAL)** |

Pursuant to the Court's order of September 15, 2021, Plaintiff Howard Iten hereby files this Amended and Supplemental Complaint for Damages and Declaratory Relief against the Defendant the County of Los Angeles (hereinafter "the County") and alleges as follows[1]:

## JURISDICTION

1. This action arises under the Contracts Clause of Article I, Section 10, of the United States Constitution. This Court has jurisdiction through 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Damages are authorized under 42 U.S.C. § 1983 and declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## INTRODUCTION

2. In early 2020, the COVID-19 pandemic struck the United States, prompting state and local governments throughout the country to shut down substantial parts of the economy indefinitely, creating widespread financial hardship.

3. The County's response has been, among other things, to suspend the right of property owners to evict commercial tenants for nonpayment of rent, as well as to substantially impair other rights held by landlords under existing commercial lease contracts, such as the guarantee of a monthly stream of income and provisions for assessing late fees and interest.

4. Mr. Iten recognizes and is himself affected by the economic hardship of the ongoing pandemic. And he has repeatedly tried to work with his tenant about lease violations both before and during the COVID-19 crisis. But as Mr. Iten's experience reveals, the County's broad commercial eviction moratorium puts landlords at the mercy of tenants who do not pay or who violate related lease terms, thereby depriving landlords not only of their income, but also of the ability to recover their property and to re-let it to more reliable lessee businesses.

---

[1] Allegations pertaining to the existence of "extenuating circumstances" are to be found in Paragraph 30, *infra*.

5. The County's commercial eviction moratorium has upended lease obligations and placed in indefinite abeyance one of landlords' most basic property rights—the right of possession—leaving them little bargaining power or remedy against breaching tenants. Meanwhile, tenants remain able to enforce all of their landlords' lease obligations.

6. The County's commercial eviction moratorium disproportionately lays the economic burden of fighting the pandemic at the feet of commercial landlords, rather than justly placing those costs on the public at large, yet it does so while doing little to keep people safely housed or otherwise serve the legitimate governmental interest in stemming the spread of COVID-19. This combination of significant economic burden and poor means-ends fit is precisely what the Constitution's Contracts Clause forbids. *See generally Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978) ("[Sovereign] power has limits when its exercise effects substantial modifications of private contracts. [L]egislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.") (internal citations and quotations omitted).

## VENUE

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). The Defendant County is considered to reside within this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this District.

## PARTIES

**Plaintiff**

8. Plaintiff Howard Iten is a retired auto repair shop owner and mechanic. With his wife, he owns a one-half fee simple interest in a commercially zoned parcel in the City of Lawndale and the County of Los Angeles. Mr. Iten's former wife owns the other half-interest in the property. (For convenience, all further references in this

Complaint are to Mr. Iten, but his wife and his former wife fully consent to the bringing of this action to vindicate their rights under their lease contract and the U.S. Constitution.)

**Defendant**

9. Defendant County of Los Angeles is a local government created under the laws of the State of California. The County's Board of Supervisors is its governing body. In March 2020, the Board's Chair issued and the Board itself ratified, pursuant to the County Code's emergency services provisions, a residential and commercial eviction moratorium. The eviction moratorium has been extended and amended several times, including in September, October, and November of 2020, January and February of 2021, and most recently at the Board's June 22, 2021, meeting.

10. The County is a "person" within the meaning of 42 U.S.C. § 1983. The County's acts set forth below were performed under color of law. The acts alleged herein occurred and took place within the County's jurisdiction.

## GENERAL ALLEGATIONS

California Eviction Law and the County's Commercial Eviction Moratorium

11. Among the estates in real property recognized in California are "[e]states for years," Cal. Civ. Code § 761(3)—*i.e.*, leases.

12. In a lease, a "lessee has a present possessory interest in the premises, [while] the lessor has a future reversionary interest and retains fee title." *Avalon-Pacific-Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC*, 192 Cal. App. 4th 1183, 1190 (2011). "A possessory interest consists of a right to the possession of real property for a period less than perpetuity by one party, the holder of the possessory interest, while another party, the fee simple owner, retains the right to regain possession of the real property at a future date." *Cal. State Teachers' Retirement Sys. v. County of Los Angeles*, 216 Cal. App. 4th 41, 55 (2013) (internal quotations and citation omitted).

13. The relationship between landlord and lessee is typically governed by express contract. A standard provision of lease contracts is to provide for the landlord's right of immediate possession of the real property and to evict the tenant in the event of the tenant's breach of the lease by, for example, failing to pay rent in a timely fashion.

14. Nearly all such evictions in California are pursued under the state's unlawful detainer law, Cal. Code Civ. Proc. §§ 1159-1179a.

15. California's unlawful detainer statutes "were enacted to provide an adequate, expeditious and summary procedure for regaining possession of real property wrongfully withheld by a tenant," which supplanted the landlord's "common law rights and remedies [including] the right to enter and expel the tenant by force." *Martin-Bragg v. Moore*, 219 Cal. App. 4th 367, 387 (2013) (internal quotations and citations omitted).

16. A residential or commercial landlord can bring an unlawful detainer action when a tenant: (1) continues in possession of the property after the expiration of the lease term; (2) continues in possession after the default in the payment of rent; (3) continues in possession after a neglect or failure to perform other conditions or covenants of the lease agreement; (4) assigns, sublets, or commits waste upon the premises contrary to the lease agreement; or (5) gives written notice of his or her intention to terminate the tenancy. Cal. Code Civ. Proc. § 1161.

17. A landlord seeking to evict a tenant who has defaulted on rent must provide written notice demanding the payment of the rent due within three business days. Cal. Code Civ. Proc. § 1161(2). If the tenant does not pay within that period and does not vacate the premises, the landlord may commence an unlawful detainer action. *Id*. §§ 1161(2), 1166. Once served with the summons and complaint, the tenant has five court days to respond. *Id*. §§ 1167, 1167.3. The tenant may move to quash or dismiss, but if the motion is denied, the tenant is given no more than fifteen further days to respond to the complaint. *Id*. § 1167.4. If the tenant defaults, the court

1  must immediately enter judgment and issue a writ of execution. *Id*. § 1169. If the
2  tenant does appear, the trial must be held no later than twenty days following the
3  request to set a trial date. *Id*. § 1170.5(a).

4       18.    As noted above, the County has had in place since March 2020 a
5  residential and commercial eviction moratorium. Although the County has repeatedly
6  amended the moratorium, since at least September 2020 the moratorium has
7  contained certain key provisions relevant to this action:

8     (i)    no commercial tenant evictions are allowed during the moratorium
9           period (currently defined as from March 4, 2020, through September 30,
10          2021, *see* Resolution of the Board of Supervisors of the County of Los
11          Angeles Further Amending and Restating the Executive Order for an
12          Eviction Moratorium During Existence of a Local Health Emergency
13          Regarding Novel Coronavirus (COVID-19) ¶ III.F. (adopted June 22,
14          2021, as amended July 14, 2021), a true and correct copy of which is
15          appended to this Complaint as Exhibit 1) for nonpayment of rent for
16          COVID-related reasons, *id*. ¶ V.A.1.a., which include any reduction or
17          loss of income or revenue resulting from any economic or employer
18          impacts of COVID-19, *id*. ¶ III.I.2.;

19     (ii)   no interest or late fees may be charged for any rent or amounts that came
20          due during the moratorium period, *id*. ¶¶ V.A.1., VII;

21     (iii)  commercial tenants with fewer than 10 employees have 12 months from
22          the end of the moratorium period to pay rent that came due during the
23          moratorium, *id*. ¶ V.C.2.a.; and

24     (iv)  landlords must accept a self-certification of the inability to pay rent for
25          COVID-related reasons from commercial tenants with fewer than 10
26          employees, *id*. ¶ V.B.2.a.

27  ///
28  ///

19. Violation of the moratorium's eviction- and rent-payment provisions is punishable as a criminal misdemeanor. *See id*. ¶ X.B.; Los Angeles County Code § 2.68.320.

20. Also since September 2020, the County's moratorium has applied to all jurisdictions within the County if those jurisdictions do not have in place a moratorium as protective of tenants as the County's. *See* Exh. 1, ¶ IV.B.2. Although the City of Lawndale, where Mr. Iten's property is located, has in place a commercial eviction moratorium, it unlike the County's requires tenants to provide documentation of a COVID-related hardship. *See* City of Lawndale Urgency Ordinance No. 1170-20, § 3.a (to receive protection, a tenant must both "notif[y] the landlord in writing of lost income and inability to pay full rent due to financial impacts related to COVID-19, and provide[] documentation to support the claim"). Thus, a commercial tenant in the City of Lawndale who has fewer than 10 employees and who self-certifies but who does not provide documentation of the inability to pay rent for COVID-19-related reasons is not protected by the Lawndale ordinance but is protected by the County's.

<u>Mr. Iten and his Commercial Property</u>

21. Mr. Iten and his wife jointly own a one-half interest in an approximately 2,600-square-foot commercially zoned rental property, located on Artesia Boulevard in the City of Lawndale and the County of Los Angeles.

22. From the late 1970s to the mid-2000s, Mr. Iten operated a successful auto repair shop on the site. Following his retirement and his son's running of the business for a few years, Mr. Iten decided to lease the property. In August 2015, Mr. Iten entered into a five-year standard commercial lease agreement with an auto repair company. In September 2016, that lessee entered into a sublease with another auto repair company (the Tenant) which purports to do business as a franchisee of a nationally recognized auto repair firm. The Tenant has fewer than ten employees.

///

23. Over the past several years, Mr. Iten has had a number of issues with the Tenant, including failure to pay rent in a timely fashion, as well as the Tenant's undertaking of unauthorized "improvements" of the property resulting in building code violations. In April 2020, the Tenant informed Mr. Iten's property management company that the Tenant "is very adversely [a]ffected by Covid 19 and . . . will not be able to pay the rent." For the next several months, the Tenant paid nothing under the lease.

24. Given this history of lease breaches, Mr. Iten would have preferred to end his business relationship with the Tenant when the 2015 lease expired at the end of August 2020 and the sublease agreement at the end of September 2020 and to commence an unlawful detainer action if necessary to evict the Tenant. But, given his understanding of the then-applicable state and local eviction moratoriums, Mr. Iten concluded that he had no prudent course of action open to him other than to negotiate a new lease with the Tenant so as to increase the chances of someday recovering the past-due rent.

25. The new lease commenced September 1, 2020, for a five-year term. It requires that base rent and operating expenses are to be paid monthly, on or before the first day of each month. If rent is not paid on or five days after the rent is due, the Tenant must immediately pay a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. Moreover, if a payment is missed, the interest charged is 10% per year.

26. In addition to base rent and operating expenses, the lease requires the Tenant to pay the past-due rent owing under the prior lease and sublease agreement, totaling about $38,700. Specifically, the Tenant must make equal monthly payments of approximately $3,200, in conjunction with payment of base rent and operating expenses, until the past-due rent is paid off.

///

///

27. The lease authorizes Mr. Iten to terminate the Tenant's right to possession by any lawful means for, among other reasons, failure of the Tenant to satisfy in a timely fashion the monetary obligations imposed by the lease.

28. Since the new lease was agreed to and initial payments made thereunder, the Tenant has failed to make any subsequent payments in a timely fashion. Moreover, the Tenant is currently over $30,000 behind what has come due under the lease since September 1, 2020.

29. In October 2020, Mr. Iten's property management firm informed him that the Tenant had stated that "times are tough and [the Tenant] will not be able to pay the full amount on time." The Tenant has never provided documentation to substantiate a COVID-related inability to meet either the prior sublease's or the current lease's terms.

30. The Tenant has not provided timely monthly notice of the inability to meet the lease's payment terms because of a qualifying COVID-related reason, as generally required under the County's eviction moratorium. Following this Court's September 15, 2021, order, Mr. Iten's property management company contacted the Tenant to inquire as to the reason for the Tenant's failure to provide monthly notices and whether extenuating circumstances exist to excuse that failure. The Tenant responded that it is "my understanding that such notice was provided while negotiating the lease already and is not on [a] month to month basis." He elaborated that "[t]hose laws and regulations and notices you mentioned . . . do give me relie[f] so I don't stress my other businesses and carry the rent as unpaid." Thus, the "answer to your question" about whether extenuating circumstances exist "is Yes." The Tenant also informed the property management company that he "won't be able to make October rent."

Injury to Mr. Iten from the Eviction Moratorium

31. Because of the eviction moratorium, Mr. Iten is prohibited from evicting, or attempting to evict, his Tenant for failing to pay in full and in a timely

fashion under the lease. Further, Mr. Iten is prohibited from charging late fees or interest, as well from attempting to recover back-rent that came due during the eviction moratorium period until twelve months following the moratorium's expiration—currently, September 30, 2022.

32. But for the eviction moratorium, Mr. Iten would immediately initiate eviction proceedings to gain possession of his property and seek other remedies available to collect rent and other amounts due from his Tenant.

## DECLARATORY RELIEF ALLEGATIONS

33. An actual and substantial controversy exists between Mr. Iten and the County over the constitutionality of the County's eviction moratorium. Mr. Iten contends that the County's eviction moratorium violates the Contracts Clause of the U.S. Constitution. The County contends that the moratorium is constitutional.

34. Mr. Iten's action is justiciable now because the County's eviction moratorium has caused and will continue to cause injury to Mr. Iten and similarly situated commercial landlords by preventing him and them from enforcing lease contracts and requiring them to submit to the physical occupation of their property by those who have no right to remain there. Mr. Iten and his wife are retired and rely upon Social Security and the revenue from the leased property to survive. But for the County's eviction moratorium, Mr. Iten would be able expeditiously to evict his nonpaying Tenant and immediately to seek to recover overdue rent, as well as to make reasonable use of his property by offering to sell it, or to rent it to tenants willing to abide by lease terms, thereby protecting his and his wife's retirement income.

35. Declaratory relief is therefore appropriate to resolve this controversy.

///

///

///

///

# CLAIM FOR RELIEF

# IMPAIRMENT OF THE OBLIGATION OF CONTRACTS

### (U.S. Const. art. I, § 10, cl. 1; 42 U.S.C. § 1983)

36. The foregoing paragraphs are hereby incorporated by reference and re-alleged.

37. The Constitution's Contracts Clause provides: "No State shall . . . make any . . . Law impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10, cl. 1.

38. Whether a law unconstitutionally impairs the obligation of contracts depends on three considerations: whether the law substantially impairs existing contractual rights; whether the government has identified a legitimate and significant public interest that the challenged law purportedly serves; and whether the law's impairment of contractual rights is reasonably related to that interest. *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018); *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983).

*Substantial Impairment*

39. The County's eviction moratorium substantially impairs commercial lease contracts, including Mr. Iten's, in four ways:

(i) The moratorium bars Mr. Iten and similarly situated commercial landlords from evicting tenants who fail, for specified reasons, to pay rent during the moratorium period. *See* Exh. 1, ¶ V.A.1.a. The moratorium thereby eliminates the key remedy that commercial landlords possess to speedily remedy a tenant's breach.

(ii) The moratorium bars Mr. Iten and similarly situated commercial landlords from requiring the payment of rent during the moratorium period, *see id.* ¶ V.C.2.a.—that is, for eighteen months and counting, *see id.* ¶ III.F. The moratorium thus substantially impinges upon landlords' contractual right to a monthly stream of income.

///

(iii) The moratorium bars Mr. Iten and similarly situated commercial landlords from assessing late fees or interest for monetary obligations under their leases that have not been satisfied in a timely fashion during the moratorium period. *See id.* ¶ VII. The moratorium thus eliminates an important inducement to encourage tenants' adherence to their contracts as well as a safeguard for assuring adequate compensation to landlords when tenants breach their lease contracts.

(iv) The moratorium bars Mr. Iten and similarly situated commercial landlords from requiring payment of rent that came due during the moratorium period until at least September 30, 2022—that is, for thirty months and counting. *See id.* ¶¶ V.C.2.a., III.F. The moratorium thus substantially increases the likelihood that landlords will never recover rent that is owed, given that the longer a debt is not collected, the greater the chances that a debtor will become judgment proof or will not be locatable.

40. These impairments on commercial lease contracts are substantial because they significantly limit the remedies available to commercial landlords, such as Mr. Iten, when tenants breach their commercial leases, and dramatically undercut the economic value and security of those contracts. *Cf. Apartment Ass'n of Los Angeles County, Inc. v. Los Angeles*, No. CV 20-05193, 2020 WL 6700568, at *5 (C.D. Cal. Nov. 13, 2020) (residential landlords likely to establish substantial impairment because "some landlords may face, at the very least, the prospects of reduced cash flow and time value of missed rent payments and increased wear and tear on rental properties, and that these effects were, at least in terms of degree, unforeseeable"), *aff'd on other grounds*, No. 20-56251, 2021 WL 3745777 (9th Cir. Aug. 25, 2021); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 383–84 (D. Mass. 2020) (residential eviction moratorium "materially undermines the contractual bargain" and "a reasonable landlord would not have anticipated a virtually unprecedented event

such as the COVID-19 pandemic that would generate a ban on even initiating eviction actions against tenants who do not pay rent and on replacing them with tenants who do pay rent").

41. Although commercial lease contracts have traditionally been subject to some measure of government oversight, there is no precedent for the substantial regulatory impairment of such contracts that the County's eviction moratorium imposes.

*Lack of Reasonable Relationship*

42. Fighting the spread of COVID-19 is a legitimate and significant governmental interest. But the County's eviction moratorium is not reasonably related to that interest because its substantial impairment of the lease contract rights of commercial landlords like Mr. Iten is not reasonably related to the fight against COVID-19 and is not based on reasonable conditions.

43. First, the eviction moratorium's substantial impairment is not reasonably related because bolstering the contract rights of commercial tenants is not closely tied to governmental efforts to combat the spread of COVID-19. For example, stay-at-home orders, a prominent part of the County's and other governments' COVID-19-related efforts, required individuals to remain in their homes, not at their places of business. Moreover, in contrast to the circumstances that may obtain in residential evictions, simply because a commercial tenant loses a tenancy does not mean that the tenant will be homeless or will be forced into group housing, or even that either of those outcomes may be likely.

44. Second, the eviction moratorium's substantial impairment is not tempered by reasonable conditions, given the absence of any provision assuring a stream of income to landlords during the moratorium period. Such an assurance has, in an analogous context, been held to be an important factor in sustaining the reasonableness of governmental impairment of contracts. *Cf. Blaisdell*, 290 U.S. at 445 ("The mortgagor during the extended period is not ousted from possession, but

he must pay the rental value of the premises as ascertained in judicial proceedings and this amount is applied to the carrying of the property and to interest upon the indebtedness.").

45. Such unreasonableness is enhanced by the absence of any County program aimed at easing the economic impact of the eviction moratorium on commercial (as opposed to residential) landlords. *Cf. Apartment Ass'n of Los Angeles*, 2020 WL 6700568, at *7 (noting that the City of Los Angeles has not "simply thrown landlords to the wolves" because it has "implemented an Emergency Rental Assistance Program . . . which will provide over $100 million in rental assistance payments to approximately 50,000 low-income households" and which will result in money being "paid directly to the tenant's landlord"); *Apartment Ass'n of Los Angeles*, 2021 WL 3745777, at *8 (noting the same). And although federal legislation has made funds available for small businesses like Mr. Iten's Tenant, the money is not required to be used for rent or related lease obligations. *See, e.g.*, CARES Act, § 1102(d)(1)(A)–(F).

46. Further, the County's eviction moratorium is not reasonably related to the economic harms that have resulted from government regulatory responses to the pandemic. Rather, the moratorium is dramatically overbroad. It makes no distinction among those businesses that have been closed during the pandemic and those, like that of Mr. Iten's Tenant, that have been deemed "essential" and thus have remained fully open for business. *See* Exh. 1, ¶¶ III.K.3, V.A.1. Moreover, the moratorium does not even require that tenants like Mr. Iten's actually prove any economic harm stemming from COVID-19 regulation. *See id.* ¶ V.B.2.a.

47. Accordingly, because the County's eviction moratorium substantially impairs the lease contracts of Mr. Iten and similarly situated commercial landlords, but is not reasonably related to any legitimate and significant governmental interest or based upon reasonable conditions, it violates the Constitution's Contracts Clause.

///

The moratorium therefore deprives Mr. Iten and similarly situated commercial landlords of their rights, privileges, and immunities secured by the Constitution.

48. The County's eviction moratorium has resulted in damages to Mr. Iten of an amount subject to proof, but reasonably assessed in an amount no less than $6,500.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff prays for relief as follows:

1. For a declaration that the Defendant County of Los Angeles's eviction moratorium on its face, and as applied to Mr. Iten and similarly situated commercial landlords, violates the Contracts Clause by precluding them from: (1) enforcing the eviction provisions in their rental contracts pertaining to the obligation to pay rent in a timely fashion during the moratorium period; (2) requiring their tenants to pay rent on a timely and monthly basis during the moratorium period; (3) collecting late fees and interest; and (4) requiring payment of rent that came due during the moratorium period prior to twelve months after the period's expiration;

2. For damages according to proof, including but not limited to nominal damages;

3. For an award, pursuant to 42 U.S.C. § 1988, or any other pertinent authority, of reasonable attorney fees, expenses, and costs; and

4. Any other such other relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Because Mr. Iten seeks damages in excess of $20 pursuant to 42 U.S.C. § 1983, he is entitled to a jury trial on all predominantly factual questions pertaining to the Contracts Clause claim advanced above. U.S. Const. amend. VII; *City of Monterey*

///

///

///

///

*v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709, 720 (1999). Mr. Iten therefore requests a jury trial and reserves all rights to the same.

DATED: September 28, 2021.

Respectfully submitted,

DAMIEN M. SCHIFF
LAWRENCE SALZMAN
JEREMY TALCOTT
KATHRYN D. VALOIS*
  (*Pro Hac Vice*)

By s/ Damien M. Schiff
      DAMIEN M. SCHIFF

*Attorneys for Plaintiff*